This morning, the 210-068 Board of Education of Meridian Community Unit School District No. 223 and all is the Property Tax Appeal Board. On behalf of the Appeal, Mr. Stuart Whitt. On behalf of the Property Tax Appeal Board, Mr. Brian Barrow. On behalf of the Property Tax Appeal Board, Mr. Michael McHatch. Thank you. Good morning, Council. Good morning. Mr. Whitt. May it please the Court, my name is Stuart Whitt and I represent the Board of Education of Meridian Community Unit School District No. 223 in this matter. In its brief, the Property Tax Appeal Board maintains that the primary issue involved in this appeal is whether Illinois law impairs the PTAB's ability to carry out its function when it determines the market value of real property that contains landfills by requiring the PTAB to consider an inferior valuation method in making its determination. We believe that this mistakes the issue. We believe that the issues are correctly stated at page 2 of our brief. But put another way, the question could be whether an owner who purchases property in 2000 and files an assessment appeal in 2003 meets its burden of going forward with evidence sufficient to challenge the correctness of an assessment when it submits a single approach appraisal that does not include the sales comparison approach and when that owner withholds all information, documentation, and details regarding its purchase. Now you believe the key case on this is the Omni case, is that correct? Both the Omni case and this Court's decision in Commonwealth Edison v. PTAB. Okay, and the Omni case, do you read that case to say and to hold that the single or a single approach appraisal is insufficient to satisfy the burden of going forward in all circumstances, regardless of the facts? A single approach appraisal that excludes the sales comparison approach is insufficient as a matter of law unless it can be established that there is no market for the subject property. All right, but now wasn't this property unique? This property was unique, as is any other type of special purpose property. But that does not render the property non-saleable. There is an active market for landfills. This particular purchaser bought three of them in March of 2000. As I indicated, in March of 2000, the BFI sold the landfill to Superior Orchard Hills, which became Onyx Orchard Hills. Following the purchase, the new owner provided no information regarding the actual consideration paid for the landfill to the Ogle County Supervisor of Assessments. The amount stated on the transfer declaration was simply the amount the fair market value as established on the prior assessment of the property in previous years by the supervisor. But now, with regard to the sales or market approach, doesn't there have to be reliable market data upon which to rely? And doesn't that include arm's-length transactions? And in this case, there really wasn't an arm's-length transaction that that could be relied on, right? Because the property was under order of the Department of Justice to be divested. Well, what happened in that particular case is Allied Waste and BFI decided that they were going to merge. As is customary in these types of cases, the Department of Justice looked into it and determined if, in fact, you want to proceed with the merger. This was not a foreclosure. This was not a sheriff's sale. The Department of Justice said, if you choose to proceed with the merger, then you're going to have to dispose of certain assets to maintain competition in the waste hauling industry. In doing so, they ordered certain assets to be sold. I think Exhibit No. 7 is the modified judgment order, and in that modified judgment order, the Department of Justice required that Allied and BFI disclose to all interested purchasers and all market participants everything except the tourney work product so that the purchasers had all opportunities for due diligence. All right, but that still wasn't an arm's-length transaction, was it? Well, it was a transaction that was sold. It was a transaction that occurred by Allied in its own best business interest pursuing the merger. But in any event, this buyer was not compelled to buy. This buyer was not under duress to buy. There's no indication that this buyer overpaid for the property. So you're saying that could be relied on? Absolutely. Is the fair cash value the same as fair market value in this case? The fair cash value and the fair market value are basically synonymous in Illinois, is my understanding. When you have an arm's-length transaction? When you have an arm's-length transaction. Now, under Illinois law now, even in the event of foreclosures, you'd have to consider that in dealing with property tax assessment disputes. That's all sales occurring after January 1, 2011. Interestingly enough also is the judgment order that the Department of Justice entered. That order was actually entered and is dated May 19th, which is nearly two months after the transaction here closed. This transaction closed on March 20th of the year 2000. The modified judgment order, Appellant's Impeachment Exhibit No. 7, was filed May 19th, 2000, two months after the closing of this property. So I don't know that this order of divestiture necessarily covered that particular transaction. There's no evidence in the record that that transaction resulted after it resulted from the entry of this order because this order was entered into court two months after that transaction closed. But in any event, this buyer was under no compulsion, no duress to purchase the property. If a seller is under duress to sell property, in the case of a short sale, in the case of a foreclosure, or in the case of a divestiture order, one would presume that that might drive down the purchase price. That doesn't necessarily presume that a well-informed buyer who has all of the rights to access the contracts, the hauling contracts, the expense and revenue data, all that's set forth in the modified order, that once they got all of that, there's no indication that they, as a willing buyer acting in their own best interest, would have overpaid for the property. If, in fact, they could maintain that they did overpay for the property, I think it was incumbent upon them to bring forth evidence showing that they had overpaid for the property. But no evidence was forthcoming. Mr. Wendt, what's our standard of review here? I'm sorry? What's our standard of review? Your standard of review on the question of whether or not the appraisals were legally sufficient, it's a question of law, and it's a de novo review on your part. With regard to whether the second issue, with regard to whether a single-approach appraisal is the best approach, given market for the property, that's a question of law. The issue of whether or not the McCann or the Main appraisal finds support in the Kelly appraisal, that's a preponderance of the evidence issue. Against the manifest weight. That's a manifest weight issue. And quite frankly, as it relates to that issue, Mr. Kelly, in submitting his appraisal report, he prepared an appraisal for the local manager of the landfill. USPAP requires that Mr. Kelly report and analyze any sales transaction involving the subject property in the past three years. In his report, he acknowledged his client's purchase of the property less than three years ago, but he never attempted to analyze the transaction. He did look at the real estate transfer declaration, and those are never determined in a property tax case. But he never received or reviewed any of the sales documents from his client. He simply chose to remain ignorant in that regard. Mr. Kelly also chose to exclude any consideration of the sales comparison approach, notwithstanding the fact that landfills regularly sell, and notwithstanding the fact that his client had recently purchased three of them, two in Illinois and one in Michigan. He excluded the sales comparison approach because, as he testified, you'd have to go and take out the elements of business that make a contribution to value. Frankly, that requirement would be no different from a hotel or any other income-producing property in this state. The job of an appraiser is to extract the business value from the value of the land in these types of transactions. An apartment complex, a hotel, a strip mall, any of these. But really, isn't there a difference between a Chicago hotel retail complex office property like they found, like was in the Omni case, than a landfill? I mean, isn't a landfill a unique piece of property? A landfill would be a unique piece of property, as would an oil refinery, as would a power plant. Those are all unique types of property, but we don't carve out special rules for them. It just happens to be the case that the Omni court involved the hotel. The Hemans Cultural Center next door is a unique piece of property with unique attributes and unique uses. If that were to sell, would not that sale be, in fact, an appropriate consideration in a market-value state such as ours? We maintain that it would be. Simply because a piece of property is unique, simply because of the fact that a piece of property is a special-use property, doesn't necessarily mean that you abandon the market approach, not at all. Well, didn't the PTAB find that the market data that McCann used in his appraisal or evaluation was unreliable? The PTAB said that the valuation data that Mr. McCann, they criticized the valuation data that Mr. McCann used. But the interesting thing about that was, of the four sales that Mr. McCann used, this buyer bought three of them. They never came forward with any evidence whatsoever to critique his sales comparison approach. Since they were the buyers of the three, he concluded that they paid $22.8 million for this particular landfill. He did that at the Board of Review, and he did that at the PTAB. We did that with our initial evidence of submission that they had the right to rebut with their evidence finding. At no point in time did they ever disclose to anybody the amount that they purchased the property for. The sales contract was never disclosed. The closing statements were never disclosed. Any conditions or liabilities that they assumed, they were never disclosed. No one involved in this case ever saw any of the contracts associated with this purchase by this particular owner, except for one person. And that one person was Jerry Jones, their rebuttal witness. They didn't give the sales documents to Mr. Jones at the time that he prepared his report, his review appraisal of Mr. McCann's work. They did, in fact, give it to him a month before he testified. And he walked into the courthouse that day, the hearing room that day, with the sales agreement in his briefcase. And we only discovered that during the cross-examination, and that, unfortunately, was the last day of trial. But this particular taxpayer basically laid back in the weeds, had nothing that they disclosed to anybody in this matter, held back, didn't report to anybody what they had paid, said that it would not be relevant in determining the fair market value of the property, and then took hot shots at Mr. McCann's appraisal. We think that that's inappropriate, and we don't think that they can sustain their burden of proof, their burden of going forward in those types of circumstances. If we take a look at what any purchaser of property does, any purchaser of income-producing property or unique income-producing property, if Ex-Lime were to sell a Byron Nuclear Power Station out here in Noble County, and we had a matter before the Property Tax Appeal Board, could the buyers hold back the contract and hold back what they purchased the property for and not share it with anyone, and then turn around and say, well, you failed in your sales comparison analysis to accurately report our transaction? We don't think that that's the appropriate path to be taken. We do believe that the PTAB in this matter is wanting to take shortcuts and is wanting to basically have all people come forward before the PTAB on equal footing. Did you ever challenge the PTAB's findings of fact, Counsel? Did the school district or the Board of Review ever do that? Challenge the PTAB's findings of fact? We didn't challenge the PTAB's findings of fact, except to the extent that the Maine appraisal and the Kelly appraisals supported each other. In point of fact, the two appraisals basically contradicted each other. Maine said that Kelly's approach was entirely unreliable. Kelly said Maine's approach was entirely unreliable, and so we don't think that they find any support with each other. Right, but the PTAB didn't say that. The PTAB didn't say that, though. That what? Just what you said. That they'd completely correct. No, they didn't say that. Didn't the PTAB find that Maine was more reliable than McCann? The PTAB found that Maine was more reliable than McCann, but Maine held back on a sales comparison approach, and it's our view that you can't hold back on a sales comparison approach. Whenever you take a look at a single approach appraisal like this court noted in Chrysler Corporation, involving the Chrysler claim out here in Belvedere, whenever you allow a taxpayer or an assessor or a board of review to use a single approach to value, that's not the sales comparison approach. You present the opportunity for the tax bill to be manipulated by simply the choice of method used. It's our position that Maine, rather than looking at the sales transaction that occurred, rather than even using it as a cross-check against his income approach, it's our view that Maine basically chose the income approach, chose the variables that go into the income approach, and concluded that the property was worth $9.6 million, notwithstanding the fact that the only evidence before the Property Tax Appeal Board was that this buyer paid $22.8 million for it. That's the only evidence that's before the Property Tax Appeal Board. Kelly, in his cost approach, Kelly says the Maine income approach is entirely unreliable, you can't use it. You have to use the cost approach. When Maine, when Kelly turns around and uses the cost approach to the exclusion of the income of the sales comparison approach, he's basically doing the same thing. And as we stated, as the court stated in Chrysler Corporation, that is not to be tolerated. We cannot find that they met their burden of going forward. You cannot also find that they meet their burden of going forward by looking to the appraisal of Mr. McCann. As this court said in the Commonwealth Edison case a couple of years ago, they have to meet their burden of going forward before the Board of Review or any interveners have any obligation to submit any evidence whatsoever. Thank you, Counsel. You'll have opportunity on rebuttal. Thank you. And then, is it Mr. Baroff? You're going to have the first five minutes of the allotted time? Yes, Your Honor. All right. Brian Baroff, Assistant Attorney General, here on behalf of the Property Tax Appeal Board. I want to confine my remarks to the Omni Chicago case and its impact on this case. If I have time for this, I just want to touch on the issue of the board's treatment of the two competing appraisal reports. Okay. The Board of Review and School District can read the Omni case far too broadly. The real holding of the case is on the bottom of page 489, the last sentence. And while the court states it in the holding, really, the negative, when you turn it into a positive statement, it comes out like this. The taxpayers' burden of going forward to challenge a B.O. Board of Review assessment with a single approach appraisal has been met where there is no evidence or market data on which to base the sales comparison reports. In other words, the use of the sales comparison report is required only where there is reliable data on comparative sales. But Counsel has indicated that he believes that there was reliable data. There wasn't reliable data. I think what the board found and I think what all of the appraisals agreed on is the data was unreliable. Why do you think that was unreliable? Well, first of all, there's evidence that all of the comparables used in the case were part of the Department of Justice divestiture, so they didn't qualify as an arm's-length transaction. Well, but Counsel disagrees. Can you speak to that? He disagrees. I mean, there's evidence in the case. The testimony in the case of the competing experts was that this was a divestiture. There's evidence that the transactions included not just the land itself but business assets, the going concern value of the landfills, including tangibles and intangibles, and that you couldn't isolate the real estate values of these landfills. I think a court-ordered divestiture of a sale, regardless of whether you consider it formally duress or not, can't be considered an arm's-length transaction. Arm's-length transaction, by definition, means a willing buyer and a willing seller. Well, you said there's a willing buyer. The seller had to sell, but the buyer didn't have to buy here. Right, but there was not a willing seller. An arm's-length transaction requires both a willing seller. You're saying both. It requires both sides. Okay. So the evidence before the Board was that the data was not reliable as comparable sales. And I think what's telling about this case is that even the Board of Review's appraiser, McCann, used the comparable sales method as a cross-check on the income method. I mean, two of the three appraisers agreed that the income method was the best approach to value these sales here. Maine testified that the sales approach was unreliable. McCann looked at comparable sales but then again decided at the end of the day that it provided at best a cross-check on the income approach. But McCann didn't, or Maine didn't use it as a cross-check, did he? Maine did not use any comparable sales as a cross-check, no. And I think when you look at the OmniChicago case, what distinguishes OmniChicago is there was considerable reliable data of comparable sales. There's something like 34 different sales involving retail space, office space, hotels that were used to evaluate the square footage and use that as comparable sales. Again, here there was not the same reliable sales. The OmniChicago case did not really break new ground in the law. It really is just a continuation and consistent with United Airlines, with the Kendall County case, and with the Chrysler case. Well, how do you respond to what your opponent says is that Onyx had purchased several landfills in the past. Why couldn't they use those as comparable? The landfills that they used as comparable, they used three landfills as comparable. That was the evidence that was brought forward in this case, were three comparable landfills. All of those landfills resulted from the same divestitures. So they're not arm's-length transactions. So none of them are arm's-length transactions, correct. And I think, you know, I think the Kendall County case is a very good case, came from this court, in which the court, you know, properly found that the evidence of reliable market data was not there. Regardless of whether there's technically no market or not, there was not reliable market data there and properly upheld the board's decision. And I think the same result should, you should have the same outcome here. The two or three of the experts agreed the income approach was the most reliable approach to valuing the landfill. There was not evidence of reliable data. And the board correctly relied on this evidence and not simply on unsupported conclusory evidence that the sales data was unreliable. Again, if I have a minute just to touch on the argument that there was inconsistency between the appraisal reports, if I might, Your Honor. This is what the board does. The board weighs the evidence. If you look at the Kendall County case again, this court has accepted the board differentiating between different appraisal reports. The board makes, weighs the evidence, and that's exactly what they did here in accepting the difference. Okay. Thank you, counsel. Thank you. Mr., how do you pronounce your last name? Mr. Bacash. Bacash. Thank you, Justice. Good morning. May it please the court, my name is Michael Bacash. I'm with the law firm of Sarnoff and Bacash. I'm here with my partner, Robert M. Sarnoff, and our associate, Jeffrey Hertz. We represent Onyx, Orchard Hill, Landfill, Inc., in this particular property tax appeal board appeal to this court. We're, of course, asking that this court affirm the decision of the property tax appeal board. The key statute in this case is 35 Illinois, 35 ILCS 200-1-50, which we cite at page 50 of our brief. It simply provides the definition of fair cash value with respect to real estate assessment purposes. It's the key statute in this case, in our opinion. The statute says, fair cash value, colon, the amount for which a property can be sold in the due course of business and trade, not under duress, between a willing buyer and a willing seller. That's the key statute that Mr. Witt has not mentioned in this case. The problem with this case, from the perspective of the taxing district and the board of review, with respect to the sales comparison approach, is that there are no sales in the record. After a seven-day hearing and a half-day of oral argument, nobody was able to provide one case of an arm's-length sale between a willing buyer and a willing seller. For that reason, and for additional reasons, those additional reasons being that the record showed that the sales of landfills are basically unique-type properties. Why are they unique? Well, first of all, they can legally be used once they're a landfill, only for a landfill. Once a landfill is closed, as pointed out in the Attorney General's brief, the property cannot be used for 30 years for another purpose once it's closed. But even though it's unique, it can't be bought and sold, as opposing counsel pointed out, right? It could be bought and sold. Okay. However, there are no sales between a willing buyer and a willing seller. Therefore, there are no sales in the record that are market sales. Only for sales. Did Maine and Kelly really have to point out, at least include evaluation of this sales comparison approach and then point out why it was unreliable? No, they didn't, because these sales don't meet the definition of market value under Illinois law or fair cash value. They're not a sale between a willing buyer and a willing seller. The seller in this case was forced to sell a property. Not only that, the record shows that the buyer had only a limited amount of time, the potential buyer, once it was put on the market through the forced sale provision of the Department of Justice compulsory sale order. They only had a certain amount of time, all potential buyers, to buy or not buy the property. So both the buyer and the seller had a certain amount of compulsion. Now, in looking over the cases, with respect to Justice, you asked whether or not they don't have a duty. Our appraisers have a duty to look at those sales in any event. I've never seen a sale that had an adjustment due to the fact that it was not an arm's length sale. That type of sale can't be adjusted. You can adjust a sale because you have one building that's big and the subject property is small. You have a land to building ratio on a comparable that's 5 to 1, but 2 to 1 on the subject. You can make adjustments for that. You can make adjustments for age of the comparable sale versus the age of the subject. You can make adjustments for location. But I have never seen a court case, nor has one been cited in this particular proceeding, where an appraiser or a court has allowed an adjustment or considered an adjustment based on the fact that the sale property, the purported comparable, and we don't think any of the sales are comparable, based on the fact that the purported comparable sold in a non-arm's length transaction. That type of adjustment simply doesn't exist in the appraisal field, nor does it exist in any court case that we've ever seen. So that's my answer to your question, Judge. Shouldn't Kelly and May have made adjustments for that? Our answer is no, because there is no adjustment that can be made under appraisal theory or under the law that we've ever seen. Your position is simply unreliable. That's correct. As a matter of law. Yes, that's correct. As a matter of law. And that's exactly what the Appeal Board found. The Appeal Board stated in the common law record at 467 that it finds that this record justifies the exclusion of the sales comparison approach because the appraisers found that reliable data could not be derived from the sale of the subject or from the sales of reasonably comparable property. Now, that particular finding, that there are no reliable sales in the record, has not been challenged as being contrary to the manifest weight of the evidence. The only challenge as to the contrary to the manifest weight of the evidence argument is the last argument that was raised by the school district and the Board of Review in their brief, where they argue that Kelly's appraisal in some way contradicts May's appraisal. Well, didn't they renounce each other's methods? They disagreed as to the best approach to value a landfill. That's correct. May wanted the income approach, and so did Mr. McCann. He disavowed his sales comparison approach, too, that he had. He wouldn't even hit his comments that the income approach was the best, and he didn't even rely on his sales comparison approach. That's his testimony in the record at page 1394, also cited in the appeal board's decision in the common law record at page 471, which is page 64 of the PTAB decision. So even McCann didn't rely on his sales comparison approach. But he used it as a cross-check. He included it in his appraisal. I don't think he testified that he used it as a cross-check. No, there is no testimony in the record. I don't recollect anything to that effect. He included it in his rigor report that was, of course, filed before the hearing, and then at the hearing he testified under oath that he didn't rely on the sales comparison approach. So I don't think he used it as a cross-check. That's not my opinion. And he did not have a cost approach in his appraisal. His other approach was the income approach, and he agreed in testimony. He agreed with Mr. Maine that the income approach was the best to use, which is what the appeal board found also. And that's another finding. I'd point out another finding that was not challenged based on contrary to the manifest way of the evidence standard. But the appeal board does have approximately 51 pages in its decision, that is, pages 3 to 54, where it discussed the evidence in the record. And then it took another approximately 16 pages to analyze the evidence, make its findings, and draw its conclusions of law. And so we would submit that they had the case for over two years also under advisement. We think the opinion is very thorough. Now, there were a couple of other questions that were raised. There was some mention about the purchase documents. Well, the purchase documents all pertain to not-arms-length transactions. Secondly, as noted by the hearing officer, if the taxing district wanted the purchase documents from the non-arms-length transaction, they should have filed a request for a subpoena. They did not do that. That's the way it's done in discovery. You ask for discovery. If you don't get it, you ask again, and then you file an affidavit as the court knows. That was not filed. And for that reason, the appeal board, the hearing officer on the record said, that's it, Mr. Witt. I'm sorry, but you're not entitled to that documentation because you didn't ask for a subpoena. And we cite it to the record on where that is in our brief. Now, with respect to the Omni case, the key fact with respect to the Omni case, as we see it, is included in footnote 3. And we fall right within footnote 3, and we fall right within the supplemental opinion on denial of rehearing. In footnote 3, the appellate court, first district, stated the reason the taxpayer lost that case was they had no sales comparison approach. And the reason they lost it was, quote, it was not demonstrated that employing the sales comparison approach would have resulted in unreliable estimates of the market value of the Omni property, unquote. That's 384, Illinois Appellate 3rd at 485. And that is specifically the finding that the appeal board went to in our case. They found that the sales comparison approach would not work, would not lead to reliable results because the sales were all non-arm's length, because the sales involved highly complex transactions. They involved a substantial amount of business value. Well, just because the sales comparison approach might have been difficult or problematic wasn't a reason not to use it, correct? I agree with you there. However, that's not the case here. It was found to be unreliable. And the key reason, and that's our first argument in the case, is that the sales were not arm's length. And we focused on that in our brief as our first argument. The other arguments dealing with personal property being included or business value being included in complex transactions, they are merely added to the fact that they were not arm's length sales. If they're not arm's length sales, they can't be adjusted. It's that simple. For that reason, the sales comparison approach need not be used. And in conclusion, just one more sentence, if I could, Your Honors. We believe that if there's any case at all where the sales comparison approach is properly omitted and need not be included, this is it. This property is a landfill. It cannot be used legally for any other purpose. It can't be used once it closes for another 30 years. All appraisers agreed that the sales in the record, there are no sales other than not arm's length sales. The sales are not between a willing seller and a willing buyer. For that reason, Your Honors, we respectfully submit that the sales comparison need not be included and that the appeal board's decision should be affirmed. Thank you, Counsel. Thank you. Mr. Witt. Counsel Witt. I'm sorry. What do you make of footnote three in the Omni case? I need you to grab it. Okay. I can read it to you again if you want. If you would. Sure. It was not demonstrated that employing the sales comparison approach would have resulted in unreliable, and that's italicized, estimates of the fair market value of the Omni property. Absolutely applicable in our case. It was not demonstrated that use of the sales comparison approach would result in an unreliable opinion as to the value of the property. It was not demonstrated. Okay. What happened here is that Mr. Kelly said that you cannot take a look at the sales comparison approach because of the fact that it involves a business value component. Because you would have to extract the business value from the transaction. Just like a hotel, just like a strip mall, you'd have to extract the business value. That's number one. Number two, Mr. Main said you can't do it because of the fact that when you buy a landfill or a hotel, and he used the example of a landfill or a hotel, you have a certain going concern value that you have to pull out, and it is difficult. Now, those two conclusions on their part is not a demonstration that it's an unreliable result. Those are simply two conclusions on their part, and those conclusions on their part are really no different than the conclusion that the taxpayer's appraiser used in the Omni case. I find it interesting that the PTAB has said that Omni is just an extension of existing law and that it really didn't bring new law. If it didn't bring new law to the case, then it's clear that the taxpayer felt carried its burden because the taxpayer submitted two single approach appraisals that contradicted and disavowed and discredited each other, both of which excluded the sales comparison approach. But didn't the PTAB cite waste management of Wisconsin versus Kenosha County, and in that case, wasn't the income approach exclusively used? No, no. If you take a careful reading of the case, the county assessor used the – I think he used the cost approach. I know that he looked at the sales comparison approach, and he also looked at the income approach and derived that the best approach to value was the income approach. You know, it's not the case that the sales comparison approach trumps an income approach. It's the fact that the sales comparison approach has to be used, and if nothing more than a crosscheck, as this Court – But didn't the Supreme Court say in that case that they approved the methodology of the income approach exclusively because there weren't any recent sales of that subject property? The Supreme Court in its case basically said that you can never use the income approach alone. That's what they said. As they were discussing the Wisconsin law, they said that using the income approach alone is never appropriate. And then they said that the appraiser in that case, I believe, used the cost approach. I know he used the sales comparison approach. Which they indicated was not useful. Which they indicated was not useful in that particular case, and they landed on the income approach. There's nothing wrong with landing on the income approach, but the problem is, is you don't carry your burden of going forward. If there's a market for the property – With the income approach alone. You're saying you can't carry – You cannot carry your burden of going forward with the income approach alone, and that's basically no different than what the Court said in waste management. In waste management, they said, in the case of a landfill, if you consider all the three approaches to value, you – it is not inappropriate for the assessor to use the income approach to value. But you can never use it alone, and the appraiser – the assessor in that case didn't use it alone. The – Mr. – Mr. Main and Mr. Kelly never said that you can't look at these sales because of the divestiture order. Not at all. They said you can't look at these sales because there's a business component value that you would have to extract out, and it's difficult to do. That's the job of an appraiser, is to extract out the business component and the personal property component. Mr. Jones, who testified in rebuttal on behalf of – of Onyx, and Mr. Palmacast, who testified on behalf of the Board of Education, they both said the presence of the divestiture order does not necessarily disqualify the sale. You have to look at the transaction carefully and try to evaluate to what extent, if any, there is duress. And there's no evidence that there was any duress on the part of Onyx. Mr. Bakash's argument that they had a very short period of time because of the order they brought and closed on the property before the order was entered. The timeframe set forth in the order didn't even kick into play until two months after they had closed on the transaction. And there's no indication – we don't even know the date of the contract. They could have signed the contract two years before the closing. Would you subpoena that information? Pardon?  In 25 years of practice before the Property Tax Appeal Board, countless cases involving high-complex properties, I have never had the PTAB issue a subpoena at our request. We have requested many, many times. School districts, my contemporaries, have gone so far as to file suit against the Property Tax Appeal Board in an effort to force them to issue subpoenas. It's most unproductive. The most recent case where that occurred involved the 1997 evaluation of Midwest Generation property. That case has yet to be heard by the Property Tax Appeal Board because of the litigation over subpoenas. Thank you very much, Counsel. Thank you. At this time, the Court will take the matter under advisement and render a decision in due course. The Court stands in recess at this time.